You may be seated. Alright, this is our second case today. It's Prakash Desai. This is the State University Retirement System of Illinois. He's arguing for the appellant is Attorney Ellis and for the accolade Attorney Lee. And we'd be doing the whole argument. Okay. Alright. Mr. Ellis? Good morning. Good morning. John Ellis Ford, the appellant, Dr. Prakash Desai. The central question that we've raised on this appeal today is whether CSRS had the power to provide any of the relief that Dr. Desai sought. And the answer to that question, I respectfully submit to you this morning, is yes. And the reason that the answer is yes is because the statute that created CSRS provides CSRS that authority. And that statute is section 177 of the pension code, which reads that one of the powers of the system is to generally carry on any other reasonable activities which are deemed necessary to accomplish the purposes of the system. Now that section of the code, Dr. Desai now has been told three times that while his situation is good and while people sympathize with his situation, that nothing can be done. But CSRS on the claims panel, the executive committee, and the circuit court, none of those bodies examined section 177 of the administrative code. And it's critical because the case law surrounding statutes like this... Did you argue that section to those entities? Your Honor, we did. And they didn't respond to your argument? My reading of the decisions, the executive committee and the claims panel decisions, is that that went unaddressed. The question at the end of the administrative hearing for the claims panel was, do we have the authority? Do we have the authority? And both sides then presented some briefs to the claims panel and then the case went up for the decisions. Didn't they all say we don't have the authority under your argument based upon section 15-177? Your Honor, respectfully, I don't read the decisions that way. Well, what did they say? The decisions said, one, the calculation that we ended up with here, the final calculation and the actual retirement benefit that you received, which is $5,700 per month, is the correct one. And since we eventually arrived at the correct result, there's nothing that anyone can do about it. The claims panel also said that section 186.1 of the pension code would have required them to correct any sort of mistake if one had been made. Do you believe that's an error? Their representation at that portion would require them to do that? Well, to answer your question as an initial matter, it's the position of section 186 doesn't even apply because it's an estimate. The $10,710 calculation that Dr. Seib was initially provided with was just an estimate. And so they don't have to correct that. The fact that they just got it right in the end result, in the end analysis, is all that's required. But to answer your question even further, I do disagree with that position because of section 177. Section 177 provides CSRS with the relief that's reasonable under the circumstances to accomplish its purposes. But what you're asking for is that he would be paid a benefit almost double of what he's receiving that he had not earned. That's a perfectly reasonable question, Your Honor. And the parties have eventually come to, I believe, a mutual understanding that the benefit that he's receiving right now, Dr. Seib is receiving $5,700, is calculated correctly. So he was misled is essentially your position. He was misled. And he relied on that misrepresentation when making his decision to retire. Well, he first relied on that representation in 2003 to switch from part-time to full-time and to work for an additional five years with the understanding that after those five years were over, his pension would be about $11,000 per month. Then he retired. So it's a two-step process. One, he stays on and he switches over to full-time for an additional five years. But didn't that increase his pension from what it would have been if he hadn't switched to full-time? I believe that it did, but not to the tune of $11,000 per month. It seems to me what you're making is essentially an equitable, estoppel argument based upon a claim that the language in Section 15-177 that the committee has the ability to engage in reasonable activities which would be necessary to accomplish the purposes of the system authorizes such a claim and authorizes them to provide equitable relief. Yes, that's correct. Is there any precedent for such an interpretation with regard to the case law? In any other context? The case law on that point says, one, when a statute creates an administrative body, they're giving you the powers not just that are delineated in the statute, but also the powers that are necessary to carry out the purpose of that administrative body. And you don't just look at the language of that statute, but you can also infer from fair implication of the language of that statute what other rights and authorities may be included in that. Well, I understand that. My question, though, is given that you're essentially making an equitable estoppel argument to us, is there any precedent for the application of such an argument in an administrative law context? If we agree with you, would we be the first to so hold? I'm sorry, Your Honor. If we agreed with you, would this court be the first to so hold? You would not be the first to hold that the administrative body has powers that exceed the expressed language in the statute, the St. Louis Federation. I'm talking about an equitable estoppel argument in particular.  provide equitable relief based on a reasonable reliance argument. The reason I'm asking that is I mentioned to Mr. Weinstein the first case where it seems like the information coming out of CSRS is just random, and I guess no one can rely upon any of it for anything. I suspect it's not the only governmental agency that screws up in this fashion, and maybe there's some precedent about others doing it and what we're supposed to be able to do when that happens. Perhaps, Your Honor. The best that we've been able to find to date, and I'm happy to work and submit a supplemental brief on this specific point, the best that we've been able to find to date is a case like the St. Louis Federation where a statutorily created panel that only has financial oversight powers that are delineated in the statute, directs a school board not to renew the contract of a superintendent, and then goes further and says, we need to work together to create requirements for qualifications for a new superintendent and to work on the job duties. Well, what's interesting, it seems to me if this were a private entity, if you were Aetna Insurance who had provided some kind of annuity situation as opposed to a pension through CSRS, that this case would be a slam dunk because equitable SOPA would clearly apply to the private entity, and the only reason it doesn't here, according to CSRS, is, gee, we're a governmental organization and we are limited by our powers to what we can do, and sure, we screwed up and gave you bad information and you were foolish enough to rely upon it, and there's nothing we can do about it. That apparently is their position in a nutshell, and I'm, of course, going to ask Mr. Lee about it when he has an opportunity, but in fact, however sad or bad that argument may be, why aren't they correct given it's the government? Well, by virtue of their being an arm of the government, they're not immune to equitable SOPA arguments. Where they've been able to prevail up to this point is simply on the administrator review count. They've been able to say that the specific agency that was created by the government doesn't have the power to provide relief that goes beyond just crunching a mere calculation. The entire basis of the argument, though, appears to be the phrase reasonable activities which are deemed necessary to accomplish the purpose of this system is a strong enough read upon which to trump what you otherwise, appropriately, have agreed would be the determination as to what your client should get by way of a pension if you just crunch the numbers correctly. You're right that our argument is that by virtue of that language in the statute, they have equitable powers. The agency has equitable powers. What we have not conceded is that, and the circuit court hasn't foreclosed this, is from bringing a separate count for equitable estoppel, an affirmative cause of action against CSRS as a separate count. I'm not sure I understood. What you haven't conceded is what? That we're somehow precluded or barred from bringing an independent cause of action against both CSRS and CSRS's employees for the conduct at issue. So this is just an administrative review matter now? This is count one of our complaint, which is for administrative review of the executive committee's decision. Counsel, you mentioned the East St. Louis Federation of Teachers case. Would you agree that in that case, that panel was to exercise financial control over the Board of Education because they were in serious financial trouble, is that correct? Financial oversight, that's correct. Right. You talked about the fact that they basically told them not to renew the contract of the existing superintendent, but wasn't that based on the fact that superintendent did not have the financial expertise that they figured was required to allow them to move forward out of the financial problems they were in? It wasn't as if they were delving into areas that did not deal with the financial problems of the district, right? One of the discussions that they had in the meeting minutes was that this particular person doesn't appear to have the financial qualifications. However, they went a step further, and that is to say, we need to work together and develop and codify job duties and qualifications, and that was not specified. What was not specified? It was not specified that those duties or those qualifications were limited to just financial qualifications. There was a reference to leadership. Okay, but isn't it fair to infer that it related to this broad responsibility of ensuring that this district had someone who had the financial expertise to lead it out of the financial situation it found itself in? I agree with this. I agree with the decision. I think that is right on, and I think by implication it is applicable here, because here the mission of CSRS, from their mission statement, is to deliver the pension to their members that it has promised them. No, I don't think it is that they have promised them. It is to provide retirement annuities and other benefits for employees as defined in the article, not what they promised, but what the person has earned. Is that correct? You have quoted the statute correctly, which I read to be extremely broad. The mission statement of CSRS says the pension and the benefit that they have promised to its members. Their mission is to deliver it. Where is that, the word promised? Bear with me one moment. At C-375 of the record we cited the mission statement, and I have it. So you are not talking about statutory language. You are talking about a mission statement? CSRS' own mission statement. What is the record? The site is C-375. Their mission statement, what does it say? The mission statement says the CSRS mission, the mission of the State University's retirement system, CSRS is, colon, to secure and deliver the retirement benefits promised to our members. By the legislature or by whom? All it says after that, Your Honor, is the purpose of this mission statement is to provide broad operational direction to the board, staff, and contractors of CSRS. But who can make a promise to a person who is going to retire from the State of Illinois? Our argument is that the purpose of these advisors and these counselors, they are all representatives of CSRS, and they are aware that the reason that people go to them and meet with them is to get information and to make educated decisions based on those. And to act upon what they are hearing. Exactly. The fools relied upon the information as being accurate. What a concept. Exactly. Let's talk about that a little bit, but they were estimates that were provided, is that correct? They were titled estimates. And they had language on it explaining that it was an estimate and that the final calculation could be different. Is that correct, counsel? You're correct, Your Honor. If you look at the document that says $10,710 per month is the calculation. The second page, or we don't have the original, it might have been the back of the page, has that disclaimer language. It's not clear and conspicuous. It's not any bigger than any of the other fonts or prints. So the fine print says rely upon this at your own risk. That's apparently what they're saying? To paraphrase it, it says this is an estimate. The numbers may change. That doesn't answer this question, Mr. Ellis. It appears that Dr. Desai received bad information, incorrect information, over multiple years, multiple times. Correct. Does the record show, or do we know, whether anyone at CSRS has been held accountable? I mean, like fired, disciplined, walked out the door on the grounds that you must be a jerk because you can't be doing your job right. Look at this particular case. This guy was full enough to rely upon your expertise, which apparently you don't have. Do we have anything like that here? The only thing I can go off of, Your Honor, is the only thing I can rely on in that regard is the argument before the circuit court. The same question was asked. And at that point, at least the Judge DeFantis was concerned, too. Judge DeFantis wanted to know. And the answer that he received was that the person is still an employee of CSRS. The person? The individual who made that calculation. Weren't there multiple people over the years who were providing this bad information? Somebody, Lee Bridges, used that information that was in the system for whatever reason. It had to have been there and provided by the employer. Somebody must have put it in there. How about that person being held accountable? That's a very good question, Your Honor. So would it be safe to say, as of this moment, no one's been held accountable for the misinformation that's been provided by CSRS over the years to Dr. Desai? The only person who has paid for that is Dr. Desai. No one at CSRS has been held accountable, to the best of my knowledge. And he's paid by getting the retirement benefit that he actually earned? He has paid for it by relying on the misinformation that he was provided to his detriment. He testified at the claims panel hearing. What would you have done if you were told that this information was different? He said, I would have continued to work. Another argument in our brief is under Section 134.1b. To the best of the record, the best that the record shows is that the information that was used in calculating that retirement benefit was provided by the employer. At some point, they got information from the employer and used that information to calculate the $10,710. A strict reading of the statute and construing it in favor of the pensioner. Counsel, I asked you about equitable estoppel because, while I don't have the cases at my fingertips, I'm aware, as I'm sure you are, that as a governmental entities. And there have been lots of other instances, and it's not just administrative agencies, where municipalities have promised things and, well, yeah, we can do this, that, and the other, only to discover that they can't or won't. And someone has sought to get equitable relief based on equitable estoppel, especially when the facts aren't even in dispute. And the position of the courts has been, well, you know, that guy from the city who promised this either was stupid or he didn't have the power to do it or he didn't understand what he was doing, but we're not going to hold the city to the promise he made, even though he was in a position to make it. Isn't that essentially the same thing we have here? Your Honor, our position, again, is that in this case, with this statute, and under these circumstances, considering the purpose of CSRS, CSRS does have the power to right the wrong. In Section 134.1b, it does say that the percentages employed in the employer, we think that it was clear from the underlying record and the underlying proceedings that the CSRS representatives testified that the information that they relied upon and that they used was provided by the employer, and that that calculation, strictly reading the statute, should be allowed. And so was the final information that they used to come to the correct calculation, was that also provided by the employer? It appears that it was. So which one do we choose? They had in their possession both sets of information, and they initially chose one and then they chose the other. Like I said before, the correct calculation appears to be what they ended up with, $5,700 per month. That appears to be the correct calculation and the one that they used. The argument is, under the circumstances of this case, considering the statutory language of Section 177 of the pension code, CSRS has the power to provide some remedy here. Thank you, Mr. Ellis. You'll have time on rebuttal. Thank you. Mr. Lee? Albert Lee for the Board of Trustees of the State University's Retirement System. This case is definitely not my favorite case. I can't imagine why. The facts are bad. We know that. The mistake was made. Mistakes were made repeatedly over years. Well, not just one. In 1998, one retirement counselor got it right, used the right figures. And then in 2003, one counselor got it wrong, and in 2008, Lee Bridges, another counselor, got it wrong as well. But then in the final calculus at the time of the certification of retirement annuity, we got it right. So it's a whole mix of things that happened. Probably, I don't know what happened exactly with regards to the 100% figures that appeared in the payroll data. Going to the first question I asked earlier, is it correct that this is business as usual? You know, gee, we're sorry, but there's no personal accountability for these screw-ups? There could be, but it depends on how long. Could be? I mean, how long is this? Aren't we talking about a couple years since this has been going on? Well, considering how many retirement counseling sessions these people do and the frequency at which the errors crop up, it appears to me that the managers didn't deem that it would be necessary to fire this individual. Maybe tell them, hey, you've got to look at the documents. Because this system is a very, very complex retirement system. To train someone up to be a retirement counselor takes years. It takes years. So it's not as easy as... I mean, doctors get their diagnoses wrong from time to time. You can't expect the CSRS retirement system to just be firing people. Actually, that's an interesting point, Mr. Lee, because I'm not sure I understand why that's the case. It seems to me that you have a statutory scheme. I'm not sure that some precocious high school senior with six months of Here are the figures. Here's how it works. That's what your pension is going to be, doctor. We wish it was that simple. The complications are many. We're dealing with information that we receive in real time, information that we need to verify after the fact. There's all sorts of things that go on. So all I can say is a mistake or mistakes were made, and we just have to accept that fact. And it's really, really unfortunate, because we wish we had equitable powers. We wish. So if you had equitable powers, what would you do? Give Dr. Desai the pension he was promised? Well, I don't know what we would do. Under what standard would we pay? It depends on what side of the bed you get up that morning, basically, if you leave it up to equitable estoppel or income. Do you agree if you were a private insurance company that equitable estoppel would apply? Well, if we were a business, I guess we would think about our branding, our image, and maybe take care of, you know, sweep things under the rug to make a profit in the long term. But because we're a governmental agency, we're bound by the dictates, mandates of the pension code, we have a greater sense of accountability to the law. If we affirm this decision, what message are we sending to the people who inquire of CSRS regarding what their pension benefits would be if they were to retire at point X or point Y? If you affirm, then you'll be telling the public that in the end we'll get it right. But in the meantime, when you're getting estimates, please get as many estimates as you can, compare them, ask questions. What does that mean, get as many estimates as you can? You mean this week and come back next week and ask again? Just keep checking as much. We have also online tools and things like that, all sorts of different tools. And they can even calculate if a precocious, you know, university professor, you know, smart enough, as you say, if a 16-year-old can do it, maybe a university professor could do it on his own as well. I find that highly unlikely. But, you know, there are ways to find out. And the fact that the retirement counselor in 1998 got it right, got a benefit around $4,000 or something, using similar assumptions in the future. I mean, the retirement dates were off by just a few years. And they were also assuming full-time employment sometime in the future. And then to come back just, what, four or five years later and then see a double in their retirement annuity? I mean, that's got to tip someone off, either Mr. Desai or somebody, that maybe something's not right with the estimates. Of course, back in 2003 is when he first changed his career plan, based upon information, wasn't it? Well, in the 1998 estimates, they did assume that there would be a switch to full-time employment at some point down the road, because they did the part-time service calculation adjustment in that estimate as well. And there was a reduction in service credit and things of that nature. So this was all, I mean, he had all of this kind of in his mind from the 90s. It just, it didn't hit a, we didn't just know about it in 2003. So he should have been on notice. He should have been on notice as to what his... Disparate statements he was receiving that something's going on. Right. But, you know, well, I mean, if it's something looks too good to be true, usually it is, you know. So, I mean, he was on notice. So that's, I guess, if we're to argue along the lines of equitable estoppel, I guess the first thing I would say is what you said, the agencies are not, you know, that wouldn't work against state agencies because of the normal factors. First, you can't use equitable estoppel as a cause of action. It's a shield, not a sword. Second, you know, there has to be reasonable reliance. I mean, like I said, there was a 1998 estimate, and then another estimate or two estimates that had double the figures. I mean, is that reliance reasonable? Also, given the fact that we have disclaimer language in our estimates saying, this is just an estimate. You know, things can happen. Errors can happen. Laws can change. You know, in the final analysis, we want to get it right in the end as the law states. Third, usually when you're bringing equitable estoppel or any kind of estoppel claim against an agency, promissory or equitable, there has to be some kind of fraud element, some real intent to deceive or something like that. Justifiable reliance is really pretty much what you rely on. I'm not sure you need fraud. Gee, I relied upon it, and I was justified in doing so. Why wouldn't that suffice? Because the reason why the equitable estoppel standard is higher when applied to public agencies is because they involve tax money, you know, the public's revenue. So we are stewards of tax money, and therefore we need – there are cases that say that equitable estoppel will not apply unless it's necessary to prevent fraud and injustice, and the state somehow induced the actor of the plaintiff's actions in that fraudulent manner. There was a disclaimer that was sent to Dr. Desai. Right. So these are just estimates and essentially rely at your own risk where, you know. Yes, that disclaimer is located on pages 1 and 13. I'm familiar with it. So here's my question. Yes, yes. What should a reasonable, careful person like Dr. Desai have done? Like I said, he should have brought the 1990 estimate with him and said, hey, what's going on? Why am I getting a sudden double? Let's assume he had done that and was told, oh, no, you know, that $4,000 stuff, then that was wrong. You're going to get $10. Now what? That would be kind of speculation. I guess we're on hypotheticals right now. Well, if we have reason to believe he was told that once, maybe he'd be told it again. Well, that would be unfortunate. If it didn't cause them to do a double take, a hard double take, that would be really. So he does it again and, you know, boy, we made another mistake, but, doctor, this is all you're going to get. Sorry. So, I mean, the best thing we can tell our members to check periodically, you know, keep coming back for information. But even if he checks periodically, he might get the same incorrect information. That can happen. You know, when you say check periodically, the implication is if you check periodically, by God, this time we'll get it right. But we don't have any reason to believe that. I mean, but based on two out of how many thousands of retirement counseling sessions do we have? Well, he only has these two today before us. Right, right, I know. So I understand why you have that kind of mentality of, oh, my God, sirs, what are they doing? Do they even know how to add or subtract? Well, that pretty much sums it up, yes. Yes, but, I mean, because I'm on House Counsel. I see what we do, and we have only very few of these cases come out. So these are aberrational? These are aberrational as far as I know, yes. It's very unfortunate. I guess another thing I want to state is we believe that this is actually, as Mr. Ellis was saying, this is an administrative review claim. It's very narrow in terms of the scope of review at this point. We're looking at the application of Section 15134.1, sub B, whether the service adjustment was done correctly using the correct information. And we, as Justice White was saying, which figures are we supposed to use, the 100% figures or the part-time figures? And it is our argument that the Board properly used the verified figures that were twice verified, once in 1998, and the next time after the retirement application was submitted and we were in final processing, that the Board was justified in relying on those figures rather than the spurious 100% figures that could have come from who knows where. So we believe that under the clearly erroneous standard, there is no way that the Court should feel a firm conviction that something was done wrong statutorily. I mean, there is a mistake, of course, in the estimate. But in terms of following the law as the agency was created to do, which, by the way, under Section 15163 says, the Board is to authorize annuities, dot, dot, dot, all in accordance with this article. So as Justice Pope was saying, and Justice White said before, yes, we're looking at what the plaintiff had earned under the terms of the statute, regardless of wayward statements of mistaken retirement counselors. The law on equitable estoppel, I believe, is pretty clear that the government is not normally subject to equitable estoppel. I think that's sound policy generally. I'm just wondering if, in the instance of pensions, the same provision ought to apply, whether or not the Supreme Court or the legislature should look at the situation and think, as opposed to the normal instance in which efforts have been made to equitably estop some government from denying some action. In this instance, this is pretty serious stuff when we're talking about how someone's going to govern their working life and plan for their retirement based upon the pension they receive. It's hard to imagine a situation that would be quite as serious as a normal equitable estoppel situation. So why shouldn't this, as a matter of policy, be an exception to the normal rule against equitable estoppel applying to the government? Well, in a matter of public policy, again, as I stated, we're involving tax revenues. And the magnitude of the mistake here is $60,000-plus per year increasing with cost-of-living adjustments over this person's lifetime. So it's a huge impact to the state if we were to just, oh, sorry, one guy made a mistake or two people made a mistake, and we're going to be on the hook for millions of dollars. Well, that's all true, Mr. Lee, but imagine the impact for Dr. Desai. Right. So that's a policy decision that, I guess, is up to the power's heart and me. Especially, it's a decision left to people in power above the board. But ultimately, we are bound by the law as it sits today. As you said, there is no precedent for applying equitable estoppel to an agency like the board. And your question, I guess, goes to what is the board? Is it a state agency? Is it quasi-governmental? Is it some kind of body politic and corporate that's kind of away from the state? Those are the three curtains. Which one is the answer? So we assessors like to kind of say we're governmental when it behooves us. But in this case, we're not. Otherwise, they're kind of a quasi-private entity. We're a quasi-private entity. We want as much independence as we want. That's true. I mean, we're not under the procurement code and things of that nature. But we do have tax revenues. We are appropriated by the state. We have governor appointees on our board who exercise control. The Board of Higher Education, the chairperson of the Board of Higher Education, is our chairperson as well. And that's an automatic appointment. So there are a lot of factors that also bring us into the kind of we're an instrumentality of the state kind of piece of this. So I think I'm arguing that equitable estoppel doesn't apply for that reason. So do you work at SERVS? Yes, I'm the Associate General Counsel. And is there follow-up when something like this happens? Oh, of course. I mean, as soon as this case came to my attention, I was on the phone with the Director of Member Services and you leave what the heck happened here. And what steps are we taking to ensure this never happens again? Of course, there are steps. And then they make the decision how to deal with this issue. Do they discipline the employee, fire them, retrain them? What do we do? I mean, that's up to the operational people. But you brought it to the proper people's attention. And I'm sure they discussed this even before it got to me, of course. I mean, it's had to have raised red flags with the counselors and everybody. I'm sure Mr. Bridges feels awful about this. Anything else, Mr. Lee? Not really. Thank you. All right, thank you. Mr. Ellis? It took months, if not over a year, for CSRS to tell Dr. Sai what the heck happened. We filed the petition for review. And Dr. Sai was told in a letter, well, we didn't have those percentages at the time that we performed the calculation. And then we received revised percentages. And we used those revised percentages to calculate your actual correct one. When she testified, Angela Lee figured out and testified that they, in fact, had the correct percentages as of 1998. But they weren't used. They used the incorrect percentages in 1998. However, they had the right ones in their possession. But we were told in 2010 by letter that, sorry about what happened, we didn't have the right information at the time. That was just not true. So the reason I address this is as a matter of policy, it would be a good public policy for Actuator Willestoppel to apply in a case like this. Because as Mr. Lee says, these don't happen that often. And so in the rare cases where they do happen, if an annuitant gets an increase in his pension because it was what he was previously promised, that would provide him with a remedy and would provide CSRS with a deterrent from ever doing this again. And it would provide them with an incentive to double-check the figures, which they said they did for the first time in 2010. When she testified, Angela Lee says, well, the reason that we got it right that last time is because before we checked it, when we were actually going to have to cut a check, we double-checked everything. They should be doing that the first time. The message to answer your question, Judge Steinman, that would be sent if you affirm here, is that these counselors and these sessions are pointless. That there is absolutely no reason to go to a CSRS counselor to receive an estimate or a calculation for any reason, because you can't rely on it at all. Are there any further questions? I don't see any. Thank you, Mr. Willis. Thank you, counsel. We'll begin recess until the next case.